IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| VICKI LYNN FRANKS, | ) | Civil Action No. 3:09-1012-SB-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning

the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42

U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On January 30, 2006, Plaintiff applied for DIB, alleging disability as of May 31, 2004.[1]

Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before

an administrative law judge ("ALJ"). After a hearing held September 17, 2008, at which Plaintiff

appeared and testified, the ALJ issued a decision dated December 15, 2008, denying benefits and

finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert

("VE"), concluded that work exists in the national economy which Plaintiff could perform.

---

[1]Plaintiff later amended her alleged onset date to August 30, 2006.

Plaintiff was forty-one years old at the time of the ALJ's decision. She has a high school education and past relevant work as a medical transcriptionist, file clerk, customer service clerk, and registration clerk. Plaintiff alleges disability due to fibromyalgia, depression, neurocognitive disorder, migraine headaches and syncope. (Tr. 42, 140-144, 149).

The ALJ found (Tr. 13-22):

1.  The claimant meets the insured status requirements of the Social Security Act through December 30, 2009.

2.  The claimant has not engaged in substantial gainful activity since August 30, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia, depression, anxiety with panic attacks and neurocognitive disorder (20 CFR 404.l521 *et seq.*).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light exertional work, which is defined as the ability to lift or carry 10 pounds frequently and 20 pounds occasionally, stand 6 hours in an 8 hour workday, walk 6 hours in an 8 hour workday and sit 6 hours in an 8 hour day provided she is not required to sit, stand or walk for more than 2 hours at a time (20 CFR 404.1567(b)). The claimant is able to perform routine, repetitive tasks but should not have production quotas. She should avoid hazardous situations. The claimant is able to occasionally climb ramps and stairs but should never climb ropes or scaffolds. She should avoid hazards.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 27, 1967 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to a determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2006 through the date of this decision (20 CFR 404.1520(g)).

On March 27, 2009, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on April 15, 2009.

## STANDARD OF REVIEW

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL RECORD

Since approximately 2000 (prior to her amended alleged onset date), Plaintiff was treated by Dr. John Lucas, a neurologist, for depression and headaches. See Tr. 240, 295. On April 24, 2002, an MRI of Plaintiff's head showed no abnormalities. Tr. 242. On August 7, 2002, Dr. Lucas noted that Plaintiff had been in a motor vehicle accident after she got lightheaded and passed out while driving. He wrote that her headaches had essentially resolved with the use of Depakote. Dr. Lucas arranged for testing to assess Plaintiff's syncope and advised Plaintiff not to drive. Tr. 249. Tilt table testing was consistent with neurocardiogenic syncope and Plaintiff was prescribed medication for her condition. Tr. 248. An EEG was normal. Tr. 246.

On October 17, 2002, Plaintiff complained that she was depressed and irate because she could not drive and was stuck in her house. Dr. Lucas diagnosed headaches, cervical spasm, depression, and neurocardiogenic syncope; altered her medication; and told her she could not drive until she had been syncope free for six months. Tr. 250. He diagnosed Plaintiff with cervical and trapezius spasms, headaches, and increased depression on May 6, 2003. Dr. Lucas treated her for cervical spasm and suboccipital tenderness in March 2004. Tr. 256. Plaintiff tested positive for mononucleosis and strep throat in June 2004. Tr. 293-294.

On June 24, 2004, Plaintiff reported that she had a near drowning experience on Memorial Day and had been poorly responsive for as long as a minute. She reported that her memory had gotten worse and she was worried she had an anoxic brain injury. Dr. Lucas's examination revealed that Plaintiff was bright, interactive, and pleasant. An EEG was normal. Dr. Lucas prescribed Depakote and referred her for testing to determine whether she had a brain injury. Tr. 257-258.

4

Dr. Kent J. Stock, an infectious disease specialist, noted on July 24, 2004 that anti-nuclear antibody testing (ANA) was positive. He suspected it was a false positive related to Plaintiff's mononucleosis. He attributed her fatigue and polyarthralgias to her viral syndrome. Tr. 312.

On October 6, 2004, Dr. William Edwards, a rheumatologist, wrote that Plaintiff had a "long history of pain" mostly involving her hands, wrists, and elbows. She also had complaints of chronic fatigue, aching, weakness, and headaches. ANA testing was unremarkable. Dr. Edwards stated that Plaintiff had fibromyalgia complicated by a very compulsive personality. He recommended that Plaintiff take Flexeril and do low-impact exercises. Tr. 299.

On November 18, 2004, Dr. Brian L. West, a psychologist, performed a neuropsychological evaluation of Plaintiff to assess her symptoms of neurocognitive deficits secondary to her near drowning experience. Plaintiff complained to Dr. West of short-term memory problems, increased anxiety, and difficulties in behavioral regulation. Testing revealed that Plaintiff had only subtle indications of slightly slower motor function speed and no evidence of poor attention regulation. She had some level of impulsivity and subtle indications of some behavioral regulatory concerns. Plaintiff displayed average intelligence. There was evidence of possible diminishment in visual recall and disturbance in the consolidation of new material, and Plaintiff's short-delay recall scores were one half to one-and-one-half standard deviations below the mean. Dr. West thought that the test results showed that Plaintiff had subtle disturbances in the right hemisphere of Plaintiff's brain which were reducing her ability for learning and memory of visual material, but noted her auditory processing abilities were intact. Dr. West concluded that Plaintiff had major depressive disorder and neurocognitive disorder with deficits in visual learning and self-regulatory functions. He thought that

her current neurocognitive measures surpassed the effects of a mood disorder and that she might need a referral for cognitive rehabilitation therapy. Tr. 225-228, 259, 261-263, 394-397.

Dr. Lucas noted that Dr. West's neurocognitive testing showed evidence of a right frontal or temporal deficit which he thought was related to her near-drowning experience. On December 16, 2004, he referred Plaintiff for further testing to rule out a seizure disorder or low-grade glioma. He also recommended neurocognitive rehabilitation therapy. Tr. 264. An EEG performed on December 30, 2004 was normal. Tr. 265. That day, Dr. Lucas prescribed Compazine for Plaintiff's complaints of nausea, and advised Plaintiff to set up cognitive rehabilitation therapy. Tr. 329. On January 4, 2005, an MRI was normal and showed no interval changes from the 2002 MRI. Tr. 330.

On June 20, 2005, Dr. Lucas noted that Plaintiff's medications had been changed because of increased depression. He also noted that Plaintiff did "fantastic" with Botox injections that helped her symptoms "a great deal." Tr. 260. The next day Plaintiff reported to Dr. West that she was doing transcription work three days a week. Tr. 392.

On August 8, 2005, Dr. West noted that Plaintiff had been using Ritalin daily, which she felt helped stabilize her mood. She reportedly was under stress, but was otherwise doing well. Tr. 391. Dr. West continued to treat Plaintiff approximately twice a month for self-esteem issues and marital problems. Tr. 385-390.

On October 11, 2005, Dr. Peter Naylor, a psychiatrist, noted that Plaintiff's mood was significantly better and her affect was appropriate. He increased her dosage of Ritalin in response to her complaints of difficulty remaining on task. Tr. 271. Plaintiff reported problems with fibromyalgia pain to Dr. Naylor on January 12, 2006. Tr. 368.

On January 2, 2006, Plaintiff reported to Dr. West that her medications helped, but she still had some self-esteem issues and marital problems. Tr. 387. On January 13, 2006, Dr. Edwards noted that Plaintiff was struggling with fibromyalgia and headaches. Tr. 341.

Dr. West, in a letter dated February 1, 2006, stated that Plaintiff had major depression, as well as a neurocognitive disorder secondary to anoxia following a near drowning experience. He remarked that Plaintiff had "been unable to maintain regular work behaviors for over a year" due to her physical and mental problems. Tr. 189.

In a letter dated February 20, 2006, Dr. Lucas wrote that Plaintiff had neurocardiogenic syncope, fibromyalgia, depression, chronic mixed headaches, cervical spasm, and had a near drowning injury with anoxic injury for which she had been evaluated and treated. He opined that "[d]ue to her memory difficulties, fatigue and cognitive complaints, she has not been able to work full-time and I along with Dr. West have recommended that she seek disability." Tr. 363.

On February 16, 2006, Plaintiff complained to Dr. Naylor of "a lot of difficulties with fibromyalgia" and of a recent death in her family. He continued her prescribed medications. Tr. 368.

State agency psychologist Dr. Mark A. Williams reviewed Plaintiff's medical records and completed a psychiatric review technique form on March 20, 2006. He opined that Plaintiff's mild cognitive disorder, depression, and anxiety resulted in mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. Dr. Williams completed a mental residual functional capacity ("RFC") assessment and opined that Plaintiff had moderate difficulties in the ability to carry out detailed instructions, interact appropriately with the general

7

public, and accept instructions and respond appropriately to criticism from supervisors. He thought she was adequately able to reliably carry out simple tasks and detailed familiar tasks to complete an eight-hour work day, could work with the public and coworkers in casual settings, and could accept non-threatening supervision. Tr. 400-416.

On March 30, 2006, Dr. Kerri A. Kolehma examined Plaintiff at the request of the Commissioner. Plaintiff stated she had pain in her hands, low back, and neck, accompanied by headaches and night sweats. She reported she had recently been diagnosed with fibromyalgia and had a lifelong history of severe depression. Plaintiff said her pain was relieved by Lyrica, reported she ran her own transcription company, and worked nine to twelve hours a week. She reported she exercised regularly and walked two miles three to four times a week. Dr. Kolehma's examination revealed that Plaintiff had a positive Finkelstein test (used in diagnosing De Quervain syndrome - an inflammation of the tendons of the thumb), but otherwise Plaintiff had normal muscle bulk and tone, range of motion, sensation, and reflexes. Plaintiff was able to heel and toe walk without difficulty and walk in a straight line without loss of balance. Dr. Kolehma diagnosed right De Quervain syndrome, fibromyalgia, and depression. She opined that Plaintiff could walk, sit, stand, reach, push, pull, grasp, and finger on an occasional to frequent basis. Tr. 418-420.

Plaintiff underwent a sleep study on July 11, 2006, which showed extremely poor sleep architecture, but no evidence of upper airway resistance syndrome. Dr. Thomas D. Kaelin thought Plaintiff might have true sleep maintenance insomnia and prescribed medication. Tr. 444, 454.

On July 31, 2006, Dr. Edward Waller, a state agency psychologist, completed a psychiatric review technique form. He opined that Plaintiff's mild cognitive disorder, depression, and anxiety disorder resulted in mild restrictions of activities of daily living; moderate difficulties in maintaining

8

social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. Dr. Waller also completed a mental RFC assessment in which he found that Plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. He opined that Plaintiff could understand and remember short and simple instructions; perform simple tasks for two or more hours without special supervision; maintain a regular work schedule; sustain appropriate interaction with peers and co-workers; make simple work-related decisions; and would perform better in a low stress job that did not require ongoing interaction with the public. Tr. 462-475, 486-484.

Dr. Jean Smolka, a state agency physician, completed a physical RFC assessment on August 24, 2006. Dr. Smolka opined that Plaintiff had the ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand or walk for six hours and sit for six hours during an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally crawl; could frequently balance, stoop, kneel, and crouch; and should avoid all exposure to hazards. Tr. 477-483.

In August 2006, Dr. West commented that Plaintiff had poor coping mechanisms and "should not work." Tr. 549. On December 20, 2006, he noted she had many stressors in her life including marital problems and her mother-in-law living with her. Tr. 548. After that, Dr. West's therapy centered on issues related to her divorce and remarriage. Tr. 540-547, 536-540

In November 2006, Plaintiff reported to Dr. Lucas that she continued to feel poorly at times with low energy and lack of sleep. She said she could not tolerate her prescribed sleep medication and reported her mood was "doing well." Examination revealed that Plaintiff had tightness in her cervical spine muscles, but her gait and reflexes were normal. Tr. 571.

Plaintiff complained to Dr. Edwards of "burning pain all over" on April 19, 2007. She noted that she was applying for disability. Tr. 527. On May 31, 2007, she said she was going through divorce proceedings which were very stressful. Tr. 525. Dr. Edwards continued to treat Plaintiff for her fibromyalgia pain through July 2008. Treatment consisted of continuation of her prescribed medications. Tr. 507-524.

In a letter dated February 3, 2007, Dr. West wrote that "current [test] results do indicate evidence of organic mental disorder, with impaired attention regulation affecting learning potential." Tr. 493. He opined that Plaintiff had marked restriction of activities of daily living, was unable to maintain a normal social life, was unable to provide enough concentration and persistence to complete a work task, and had been unable to function outside of a supportive environment for more than a year. Dr. West stated that Plaintiff had "a number of stressors since her near-drowning episode, which have included dramatic reduction and, now, discontinuation of any work effort because of her inability to maintain tasks, along with social and domestic issues." Id.

On March 19, 2007, Dr. Lucas' examination revealed that Plaintiff was awake and alert and her mood and affect were appropriate. He provided Plaintiff with occipital nerve blocks and noted she was waiting for approval to have Botox injections. Tr. 567. On July 2, 2007, Plaintiff reported she was having recurrent syncopal episodes and severe headaches, but admitted she had been off her syncope medication for nine months. Dr. Lucas advised Plaintiff to go back on this medication. Tr.

564. He provided Plaintiff with a Botox injection for her cervical dystonia and noted that she had "done wonderfully with Botox in the past[,]" but it had been over a year since her last injection and she had become tighter and more uncomfortable. Tr. 563-564.

On September 13, 2007, Dr. Edwards completed a fibromyalgia questionnaire in which he stated that Plaintiff had chronic pain and was incapable of performing even low stress jobs. He thought she could occasionally lift up to fifty pounds. Dr. Edwards stated that Plaintiff would probably miss work more than four days a month. Tr. 495-501. An MRI of her brain performed the same day was unremarkable. Tr. 561.

On September 5, 2007, Dr. Lucas wrote that Plaintiff's "significant other" called the previous day to report Plaintiff was having stroke-like symptoms. He advised Plaintiff to go immediately to the emergency room, but Plaintiff refused to go, and instead presented to Dr. Lucas for her routine appointment. His examination revealed that Plaintiff was sitting, staring blankly in a chair. She would not give any speech output. She would stand, but would not walk and gave no effort with any muscle testing. She had elevated blood pressure and indicated she had a headache. Dr. Lucas arranged for Plaintiff to be transported to the emergency room. Dr. Lucas noted on September 11, 2007 that Plaintiff's hospital evaluation was unrevealing. He thought her episode represented atypical and complex migraine phenomenon "worsened by tremendous stress load." On examination, Plaintiff was awake, bright, interactive, pleasant, and entirely nonfocal. He diagnosed neurocardiogenic syncope and migraine headaches. He advised Plaintiff to take baby aspirin everyday and continue her other medications. Tr. 559.

11

On October 10, 2007, Dr. Naylor completed a medical source statement regarding an individual's mental impairments. He reported that Plaintiff's GAF was fifty currently[2] and had been so for the past year and that she would be absent from work more than four days per month. On the form, Dr. Naylor checked boxes indicating that Plaintiff was either "unable to meet competitive standards" or had "no useful ability to function" in all areas of mental functioning. Tr. 502-506.

On January 11, 2008, Plaintiff reportedly had stopped taking her medication for syncope. Dr. Lucas advised her to restart it or she could not drive. Dr. Lucas's examination revealed that Plaintiff had no focal weakness or reflex asymmetry and her gait and speech were normal. He provided another bilateral occipital nerve block. Tr. 555-556.

On February 26, 2008, Plaintiff reported she was doing reasonably well other than increased panic attacks, had three weeks of headache relief with the nerve block, and experienced only one lightheaded episode. Dr. Lucas provided another occipital nerve block. Tr. 552-553.

In a letter dated February 26, 2008, Dr. Lucas outlined Plaintiff's medical history and stated that "the multitude of above diagnoses would severely limit her ability to work and I do strongly feel that she should be entitled to disability and social security benefits." Tr. 550. On August 21, 2008, Dr. Lucas noted that Plaintiff looked more comfortable and her stress load was "doing a little better." He renewed her prescriptions and advised her to continue to work with psychiatry. Tr. 551.

---

[2]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 598 n. 1 (9th Cir. 1999). "A GAF score of 41 to 50 is classified as reflecting "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job).'" Boyd v. Apfel, 239 F.3d 698, 702 (5th Cir. 2001).

## HEARING TESTIMONY

Plaintiff stated that her condition became progressively worse since her near drowning accident. Tr. 43-45. She said her husband found her in the water unconscious and not breathing, he performed CPR on her, and she did not receive any emergency medical treatment. Tr. 50-51. Plaintiff testified that she had been a medical transcriptionist, but she started having increasingly greater difficulty with her ability to concentrate. Tr. 51. She started working part-time and eventually stopped working in 2006. Tr. 52. Plaintiff also complained of panic attacks, depression, fibromyalgia, headaches, and fatigue. Tr. 52-54. She reported experiencing migraine headaches once a week, which lasted for about twenty-four hours. She took Compazine, Phenergan, Soma, Zanaflex, Flexeril, Ambien, Sectral, Prozac, Geodon, and Lamictol. Tr. 54-56.

Plaintiff reported that she took care of her thirteen-year old daughter and her apartment, but did not do much else. Tr. 45. She said her daughter helped with the housework and grocery shopping. Tr. 47. Plaintiff continued to drive a car. She estimated she could sit for about thirty minutes at a time and then had to get up and walk around for ten to twenty minutes. Plaintiff said she could sit for only about four hours total in a day, could stand and walk for only a couple of hours, and needed to alternate between sitting and standing. Tr. 57. Plaintiff also testified that she had to lie down and recline in a chair a couple of times a day for an hour or two at a time. Tr. 58. She reported panic attacks that occurred twice a day and lasted thirty to forty-five minutes. Tr. 59.

## DISCUSSION

Plaintiff alleges that the ALJ failed to: (1) consider the effects of her non-severe impairments on her RFC; (2) properly consider medical source opinions which were inconsistent with the ALJ's

RFC assessment; and (3) pose a complete hypothetical to the VE. The Commissioner contends that

the ALJ's decision is supported by substantial evidence[3] and free of reversible legal error.

A.    RFC

Plaintiff asserts that the ALJ failed to consider the effects of her non-severe

impairments on her RFC. Specifically, she argues that the ALJ failed to mention her non-severe

impairments of sleep disorder, chronic fatigue, suicidal ideation, obsessive-compulsive disorder,

chronic pain, Epstein Barr virus, or Parvovirus. She also alleges that the ALJ did not properly

consider her non-severe impairments of neurocardiogenic syncope and chronic migraine headaches

and did not discuss what functional limitations and restrictions could or could not be reasonably

expected from these impairments. The Commissioner contends that the ALJ properly considered the

effects of Plaintiff's severe and non-severe impairments in determining her RFC and that Plaintiff

has not proven what, if any, additional work restrictions were necessary to capture the effects of the

impairments the ALJ did not find severe.

In evaluating a claim for disability insurance benefits, the Commissioner is required to

consider the combined effects of a claimant's impairments, and he must adequately explain his

evaluation of the combined effect of those impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir.

---

[3]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence but
> may be somewhat less than a preponderance. If there is evidence to justify a
> refusal to direct a verdict were the case before a jury, then there is "substantial
> evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th
Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established
exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

1989); Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989); Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(B), and the general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987); see also Hines, 872 F.2d at 59. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p.

Here, the ALJ properly considered the majority of Plaintiff's non-severe impairments in determining her RFC, but does not appear to have fully considered her migraine headaches. Contrary to the Plaintiff's arguments, the ALJ considered Plaintiff's sleep disorder, chronic fatigue, chronic pain, Epstein Barr virus, and Parvovirus. The ALJ discussed Plaintiff's treatment history (see Tr. 17-20) and concluded that "[b]ased on the record as a whole, the undersigned finds the limitations described above provide adequate accommodation for the combination of the claimant's mental and physical limitations, taking into account loss of concentration due to pain issues." Tr. 20. The ALJ noted the results of Plaintiff's sleep test. Tr. 18. The ALJ wrote that "the claimant's primary care physician suspected the combination of the claimant's Parvovirus was contributing to her polyarthralgia syndrome." Id. He also noted, however, that lab results in June 2007 "were all normal, including the test for mononucleosis." Id. Although Dr. Edwards commented that Plaintiff's condition was complicated by her "compulsive personality" (Tr. 229), there is no indication that she was ever diagnosed as having obsessive-compulsive personality disorder, or that she ever received treatment for such. Although Plaintiff may have felt suicidal at times, this is a symptom of her depression and/or anxiety, impairments which the ALJ found severe. Tr. 15. Further, Plaintiff has

not shown that these impairments placed any additional restrictions on her ability to work or further reduced her RFC.

Although Plaintiff was diagnosed with neurocardiogenic syncope and took medication, it appears that Plaintiff complained of having recurrent episodes when she stopped taking her medication for long periods of time. See Tr. 564. The ALJ found that Plaintiff's syncope was "medically controlled." Tr. 18. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1165-6 (4th Cir. 1986). Further, there is no evidence showing that Plaintiff is incapacitated by neurocardiogenic syncope. She continues to drive an automobile. Tr. 62, 555. Plaintiff has not shown that her syncope places any additional restrictions on her ability to work or further reduces her RFC. Contrary to Plaintiff's argument that the reason for the limitations from hazardous work conditions "is not explained" (Plaintiff's Brief at 14), the ALJ specifically stated that "[a] restriction from hazards is included [in Plaintiff's RFC] in the event of an episode of syncope even though it is deemed to be medically controlled." Tr. 18.

The ALJ, however, does not appear to have considered Plaintiff's impairment of migraine headaches in determining her RFC. Although he mentions that Plaintiff was diagnosed with bilateral occipital neuralgia in January 2008 (Tr. 18), he makes no mention of the treatment of Plaintiff by Dr. Lucas for migraine headaches. Plaintiff was prescribed medications for pain and nausea from her headaches and received nerve blocks. She testified that she had migraine headaches at least once a week and they lasted about twenty-four hours each time. Tr. 54. This action should be remanded

16

to the ALJ to fully consider the combined impairments of all of Plaintiff's severe and non-severe

impairments in determining her RFC.[4]

B.      Treating Physicians' Opinions

Plaintiff alleges that the ALJ did not properly consider the medical source opinions

which were inconsistent with the ALJ's RFC assessment. In particular, she argues that the ALJ erred

by not even mentioning the opinion of her neurologist (Dr. Lucas), by giving no weight to Dr. West's

opinion, giving little weight to Dr. Naylor's opinion, and giving little weight to Dr. Edward's opinion

concerning her non-exertional limitations. The Commissioner contends that the ALJ properly

weighed the medical opinions of record and that his subsequent RFC assessment is supported by

substantial evidence.

The medical opinion of a treating physician is entitled to controlling weight if it is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 416.927(d)(2); Mastro

v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion

is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should

be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under

such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating

---

[4]It is not possible to determine whether the ALJ posed a proper hypothetical to the VE because it is unclear at this point what her RFC is and thus it can not be determined whether the hypothetical fairly set out all of her impairments. In order for a VE's opinion to be relevant or helpful, it must be based upon a consideration of all the other evidence on the record and must be in response to hypothetical questions which fairly set out all of the plaintiff's impairments. Walker v. Bowen, 889 F.2d at 50. The questions, however, need only reflect those impairments that are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d). Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to give no weight to the opinions of Dr. West and to give little weight to Dr. Naylor's opinion is not supported by substantial evidence. Dr. West was Plaintiff's treating psychologist, who first saw her in November 2004, and regularly provided her with psychotherapy from May 2005 through August 2008. He also conducted objective neuropsychological testing. See Tr. 385-393, 536-549. Dr. Naylor prescribed medications for Plaintiff's mental impairments on a regular basis beginning in 2004. See Tr. 366-382, 429-433. The ALJ appears to have discounted these opinions primarily based on Plaintiff's activities of daily living showing that during the relevant time period she went through a divorce, had primary custody of her teenage daughter, provided transportation for her daughter, and grocery shopped with her daughter. It is unclear from the ALJ's decision if the factors outlined in 20 C.F.R. § 404.1527 were considered in discounting these opinions. Further, it is unclear from the decision whether these opinions are supported (or not supported) by the clinical evidence or whether they are consistent (or inconsistent) with other

18

substantial evidence. The Commissioner argues and cites examples of Dr. West's own treatment notes contradicting his opinion. Also, the Commissioner argues that neurocognitive testing by Dr. West showed some cognitive deficits, but not the extreme limitations suggested by him in 2006 and 2007. Additionally, the Commissioner argues that Dr. Lucas advised Plaintiff to pursue neurocognitive rehabilitation, but she never followed through on this recommendation. These reasons for discounting Dr. West's opinion, however, are not articulated by the ALJ in his opinion.

Plaintiff argues that the ALJ failed to consider the opinion of her treating neurologist, Dr. Lucas, at all. Review of the ALJ's decision reveals that the ALJ cited to the exhibits containing Dr. Lucas's opinions (exhibits 6F and 29F) and appears to have discounted them because they were on issues reserved to the Commissioner.[5] See Tr. 18-19. There is, however, no mention of Dr. Lucas in the decision, nor any discussion of his long-term treatment of Plaintiff for her neurological impairments.

The ALJ's decision as to Dr. Edward's opinion, however, is supported by substantial evidence. The physical limitations found by Dr. Edwards were actually less than those found by the ALJ. The ALJ noted that Dr. Edwards' opinion would result in finding that Plaintiff was able to perform heavy work and then found that "[b]ecause of the combination of the claimant's

---

[5]An ALJ is not bound by a conclusory opinion of disability or entitlement to benefits, even when rendered by a treating physician, since the issue of disability is the ultimate issue in a Social Security case and that issue is reserved for the Commissioner. See 20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner); King v. Heckler, 742 F.2d 968 (6th Cir. 1984); Montijo v. Secretary of Health & Human Servs., 729 F.2d 599, 601 (9th Cir.1984).

musculoskeletal impairments and subjective complaints, a limitation to 'light' exertional work is appropriate and most favorable to the claimant." Tr. 19. He also dismissed Dr. Edwards' opinion that Plaintiff would "probably" miss more than four days per month as speculative. There is nothing in Dr. Edwards' treatment record to support such a limitation. Further, the ALJ discounted Dr. Edwards' opinions related to her mental abilities because it was not within his knowledge based on his treatment of Plaintiff. Id.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to fully consider the opinions of Plaintiff's treating physicians and psychologist (Drs. Naylor, West, and Lucas), consider all of her impairments in determining her RFC, and pose a hypothetical to the VE which fairly sets out all of her impairments.

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 31, 2010
Columbia, South Carolina